UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


IRA ALSTON,                              :
        Plaintiff,                    :
                              :
      v.                              :        Case No. 3:09-cv-207(CSH)
                              :
BUTKIEWICUS, et al.,                     :
        Defendants.                   :


<u>RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. #98]</u>

      In this civil rights action, the plaintiff, Ira Alston, an inmate in a Connecticut correctional facility, alleges that on several occasions in July 2007, February 2008, October 2008 and January 2009, the defendants used excessive force against him by spraying him with a chemical agent and/or confining him in restraints for an extended period. The defendants, Captain Butkiewicus, Lieutenant Jackson, Lieutenant Casey, Captain Salius, Lieutenant Rae, Lieutenant Saylor, Lieutenant Riordan, Lieutenant Siwicki, Lieutenant Harnett, Warden McGill, Deputy Warden Rose, Deputy Warden Rodriguez, former Deputy Commissioner Murphy and former Commissioner Lantz, have filed a motion for summary judgment. For the reasons that follow, the defendants' motion is granted.

I.     <u>Standard of Review</u>

      In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The moving party may satisfy this burden "by showing–that is pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted).

Once the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion for summary judgment. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). Merely verifying the allegations of the complaint in an affidavit, however, is insufficient to oppose a motion for summary judgment. *Zigmund v. Foster*, 106 F. Supp. 2d 352, 356 (D. Conn. 2000) (citing cases).

When reviewing the record, the court resolves all ambiguities and draws all permissible factual inferences in favor of the party against whom summary judgment is sought. *Patterson v. County of Oneida, NY*, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate. *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, "'[t]he mere of existence of a scintilla of evidence in support of the [plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiff].'" *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (quoting *Anderson*, 477 U.S. at 252)).

When reviewing evidence submitted in support of a motion for summary judgment, the court can rely on video recordings. "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that court should have viewed facts in light depicted by videotape rather that as presented by non-moving party).

II.     Facts[1]

The plaintiff currently is serving a thirty-six year sentence.  He was confined at Northern Correctional Institution at all times relevant to this action.  The plaintiff asserts claims concerning several separate incidents.

July 22, 2007 Incident

After the distribution of his noon meal, the plaintiff blocked the food trap in his cell door with his foot and a blanket so correctional staff could not close and secure the trap.  The plaintiff refused orders to remove the obstruction and said that he was blocking the trap because his morning meal bag had a hole ripped in it and was altered.  The plaintiff refused the morning bag meal and demanded another one.  No substitute meal bag was provided.

After the plaintiff refused to permit the trap to be closed, defendant Captain Butkiewicus went to the plaintiff's cell and ordered him to remove the obstructions.  The plaintiff refused. Defendant Butkiewicus told the plaintiff that, if the plaintiff removed the obstructions, he would look

---

[1]  The facts are taken from the defendants' Local Rule 56(a)1 Statement of Material Facts. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party.  Each admission or denial must include a citation to an affidavit or other admissible evidence.  In addition, the opposing party must submit a list of disputed factual issues. *See* D. Conn. L. Civ. R. 56(a)2 & 56(a)3.

The plaintiff has been afforded numerous extensions of time to respond to the defendants' motion for summary judgment.  On June 28, 2012, the plaintiff was advised that his final deadline for responding to the motion was July 16, 2012 and that the deadline would not be further extended.  Notwithstanding that advice, the plaintiff did not respond to the motion for summary judgment until July 26, 2012.  His response included a purported Local Rule 56(a)2 Statement.  However, even if that statement were not untimely, it does not generally contain the required citations to evidence, or meet the substance of the facts alleged.  Accordingly, the defendants' facts are deemed admitted.  *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.").

into the issue of the morning meal.  The plaintiff again refused.  Defendant Butkiewicus explained to the plaintiff that correctional staff were not required to provide substitute meal bags until he found one acceptable, that his refusal of the morning meal bag could be considered a voluntary meal refusal, and that he could file a grievance regarding the incident if he believed that correctional staff had not acted appropriately.  Despite these arguments and explanation that blocking the trap was not an appropriate response, the plaintiff refused to remove the obstruction.  After approximately thirty minutes, a nurse and social worker were called to try to gain the plaintiff's compliance.  The plaintiff rejected their efforts.  Defendant Butkiewicus told the plaintiff that if he failed to comply, he would receive a disciplinary report for interfering with safety and security and that a chemical agent would be deployed to force compliance.

After the plaintiff ignored defendant Butkiewicus' final order to remove the obstruction, a one-second burst of chemical agent was deployed into the cell.  The blanket blocking the trap rendered the chemical agent ineffective.  After about a minute, correctional staff were able to pull the blanket from the trap.  Defendant Butkiewicus deployed a second burst of chemical agent into the plaintiff's cell.  This time, the chemical agent had the desired effect.  The plaintiff complied with orders to back up to the trap so restraints could be applied to his wrists.  The plaintiff immediately was escorted to a shower unit for decontamination.  His head and face were placed under the water for several minutes.  The plaintiff did not complain that the water was too hot and did not attempt to move his head out of the shower stream.

The plaintiff was taken to a new cell, strip-searched, given clean clothing and bedding and placed on in-cell restraints.  The plaintiff's hands were cuffed in front of his body, his legs were shackled and a tether chain was applied connecting his hands and feet.  The tether chain was adjusted

4

so the plaintiff's wrists could reach shoulder level when he was seated.  The plaintiff was checked by medical staff.  He accepted further irrigation of his eyes to relieve residual effects of the chemical agent.  When asked about any injuries, the plaintiff stated that he was scratched by a female officer.  The scratch was treated.  The nurse checked the in-cell restraints and found them properly applied and spaced.  The plaintiff could walk upright in the restraints and made no complaints.

The plaintiff was placed on modified meal status and a fifteen minute watch.  As he had been advised, he also was issued a disciplinary report for interfering with safety and security.  That evening, a nurse went to the plaintiff's cell to check his restraints.  The plaintiff was on the bunk, under the covers.  He refused to come to the cell window to enable the nurse to check his restraints.  The following morning, defendant Lieutenant Saylor went to the plaintiff's cell to check his restraints.  The plaintiff refused to allow defendant Saylor to check his restraints and used profanity and insulting language toward defendant Saylor.  That evening, a nurse checked the plaintiff's restraints.  She found ample spacing and intact skin.  The plaintiff denied any injuries and made no complaints.

In the morning of July 24, defendant Lieutenant Rae went to the plaintiff's cell to determine whether he should be removed from in-cell restraint status.  The plaintiff remained under the covers and refused to comply with defendant Rae's order that he sit up on the bunk and show him the restraints.  Defendant Rae told the plaintiff that in-cell restraint status would be continued if he did not comply with the order.  The plaintiff refused and in-cell restraint status was continued.  At about the same time, a nurse went to the plaintiff's cell to check his restraints.  The plaintiff refused to get off the bed and come to the window.  The plaintiff said that his body was too sore to get up.  He did not complain of a headache or indicate that he experienced difficulty speaking.  That evening, the

5

plaintiff again refused to get up and come to the trap in the cell door for his restraints to be evaluated.

On the morning of July 25, defendant Saylor went to the plaintiff's cell to evaluate in-cell restraint status. He spoke with staff and with the plaintiff. At the time, the plaintiff's clothing did not appear soiled and the plaintiff did not report that he was unable to eat his meals because of the restraints, or that he had a headache or had difficulty speaking. The fifteen minute check sheet showed that the plaintiff had not engaged in disruptive behavior. At this time, the plaintiff was complying with defendant Saylor's directions. As a result, defendant Saylor ordered that he plaintiff be removed from in-cell restraint status. At that time, the plaintiff was evaluated by a nurse. The only issue was slight redness on his wrist and ankles. The plaintiff did not complain about soiled clothing, headaches or difficulty speaking. The plaintiff was provided a shower. Because there were no available cells, he was returned to the same call after the shower.

<u>February 14, 2008 Incident</u>

At about 6:45 p.m., on February 14, 2008, the plaintiff, along with several other inmates, covered his cell window. All of the inmates refused orders to remove the coverings. Defendant Lieutenant Casey opened the trap in the plaintiff's cell door to look in and ensure that the plaintiff was safe. When the trap opened, the plaintiff stuck his arm through the opening and prevented the trap from being closed. The plaintiff refused numerous orders from defendant Casey to remove his arm.

The plaintiff told defendant Casey that he had not gotten his 6:00 p.m. phone call and would only remove his arm if he got the call. Defendant Casey told the plaintiff that he did not get the call because there was a Code Orange in the unit. Staff were occupied dealing with an inmate who had harmed himself and had gotten behind in other duties. Defendant Casey told the plaintiff that he

would arrange for the plaintiff to get his call later that evening if the plaintiff removed his hand from the trap.  In response, the plaintiff demanded the phone call before 7:00 p.m.

The plaintiff refused additional orders to remove his arm from the trap and to present his hands to be cuffed.  A social worker was called but could not get the plaintiff to comply.  Defendant Casey repeatedly told the plaintiff he did not want the incident to escalate and asked the plaintiff to remove his arm.  The plaintiff refused to comply.  Defendant Casey then issued multiple orders that the plaintiff turn around so he could be placed on in-cell restraints.  The plaintiff said that he was not going on in-cell restraints and demanded his phone call.

Defendant Casey finally told the plaintiff that if he did not comply, hands-on force might be used.  The plaintiff was not persuaded.  Defendant Casey also warned the plaintiff that failure to comply would result in the issuance of a disciplinary report and loss of phone privileges.  Despite repeated offers of compromise, the plaintiff demanded a phone call to cease his disruptive behavior.  Defendant Casey stated that, if the plaintiff refused to permit staff to secure him, a chemical agent would be deployed.  After ten minutes of warnings, defendant Casey deployed a one-second burst of a chemical agent.  The chemical agent did not have the desired effect.  The plaintiff refused to remove his arm and blocked the trap with his shoulder and chest.  When the cell door was opened to allow a second deployment of the chemical agent, the plaintiff came to the door and challenged correctional staff.

Additional correctional staff arrived with a safety shield.  The plaintiff backed into his cell, but continued to refuse to comply with orders.  Two additional bursts of the chemical agent were deployed through the door and then the door was closed.  The plaintiff continued to refuse to back up to the trap so restraints could be applied.  The cell door was reopened, a third burst of chemical

agent was deployed and the door closed.  After several minutes, the chemical agent had the desired effect and the plaintiff complied with the order to approach the trap to be restrained.

After restraints were applied, the plaintiff was escorted to the shower unit for decontamination. While being escorted, the plaintiff began to resist staff.  Another one-second burst of chemical agent was deployed to regain compliance.  The chemical agent missed the plaintiff and struck the wall.  While restrained, the plaintiff was placed alone in a shower and told to place his head and face under the water.  The plaintiff decontaminated himself under the water for three minutes.  During this time, correctional staff tended other duties in the unit.  After the session, defendant Casey asked the plaintiff if he would like the shower activated for another three minutes. Although the plaintiff did not respond, defendant Casey provided the plaintiff another three-minute shower session.  The plaintiff voluntarily stood under the water and did not complaint about the water temperature.

After the shower, the plaintiff was taken to the medical triage room and examined by a nurse. When the plaintiff complained about burning eyes and skin, his eyes were flushed.  The nurse told the plaintiff that the burning sensation on his skin would dissipate over time.

The plaintiff was strip-searched, provided clean clothing, including a jumpsuit tied around his waist to enable him to tend to bodily functions while restrained.  The length of the tether chain between his hands and feet was adjusted to permit his wrists to reach his waist while standing erect. The nurse checked the restraints and found ample spacing.  The plaintiff complained of left wrist pain, but the nurse observed no inflammation.  The plaintiff did not complaint that the restraints were too tight or the tether too short.  A fifteen minute watch was imposed.

February 15, 2008 Incident

On February 15, 2008, defendant Lieutenant Rae told the plaintiff that he was going to be moved to another cell because they needed the plaintiff's current cell to house an inmate on four-point stationary restraints. The plaintiff stated that he wanted to be taken off in-cell restraints and returned to his original cell. Defendant Rae explained that the plaintiff's in-cell restraint status would be reviewed by the second shift supervisor. The plaintiff became disruptive and refused to comply with the order to move. Medical and mental health staff attempted to intervene and gain the plaintiff's compliance, but were unsuccessful.

The plaintiff complied with the order to remain on his bed when correctional staff entered the cell. When ordered to walk to the new cell, however, the plaintiff refused and told correctional staff to drag him. When staff lifted him to a sitting position and to his feet, the plaintiff passively resisted by remaining limp. The plaintiff was returned to the bed and mental health staff attempted to coax him to comply and avoid use for hands-on force. The plaintiff refused. Four correctional officers lifted the plaintiff at his shoulders and legs and carried him to the new cell. The plaintiff was in full restraints. He did not complain of pain or discomfort while he was being carried.

En route, the plaintiff was placed on the dayroom floor in a sitting position. The plaintiff became disruptive. He repeatedly urged other inmates to refuse staff directions and ignored orders to stop this behavior. The plaintiff then laid down on the floor on his back with his hands comfortably at his waist and legs fully stretched. After five minutes, the plaintiff again was ordered to stand and walk to the new cell. The plaintiff refused and was carried to the cell. The plaintiff then was placed in four-point soft restraints for four hours as a result of his disruptive behavior of inciting other inmates. Once secured, the restraints were checked by medical staff and found to be properly

9

applied. The plaintiff did not complain of pain or discomfort. The plaintiff was checked by medical staff every fifteen minutes. He was released from four-point soft restraints after less than twelve hours.

The plaintiff was placed in full metal restraints and taken to another cell. The cell was clean and sanitary. The walls were clean and there were no feces, urine or blood in the cell. The plaintiff complained that the tether chain was too short. Medical staff checked the clearances and found them appropriate. The plaintiff was checked every fifteen minutes.

The following day, defendant Lieutenant Siwicki assessed the plaintiff's restraint status. Based on staff accounts and the restraint checklist, defendant Siwicki decided to remove the plaintiff from in-cell restraint status. When he told the plaintiff that he would be removed from in-cell restraint status and moved to a population cell, the plaintiff refused to move. Defendant Siwicki decided to allow the plaintiff to remain on in-cell restraint status. He recorded the refusal using a hand-held video camera. On February 17, 2008, the plaintiff cooperated with his removal from in-cell restraint status but remained in the same cell.

February 18, 2008 Incident

During lunch hour on Monday, February 18, 2008, the plaintiff stuffed his mattress in the food trap in the cell door, preventing it from being closed. The plaintiff complained that he was denied cleaning supplies to clean urine, feces and blood that was smeared on his cell walls. The plaintiff was aware that cleaning supplies were only distributed on Saturday. Although the plaintiff alleged that he did not put the urine, feces and blood on the cell walls, the video of the cell when the plaintiff was first admitted shows that the walls were clean.

Defendant Saylor repeatedly ordered the plaintiff to remove the mattress from the trap. The

plaintiff refused.  Defendant Saylor called medical and mental health staff to try to persuade the plaintiff to comply with the order and to ensure that there was no medical reason he was unable to comply.  Although the plaintiff was found able to remove the mattress, he refused to do so. Defendant Saylor warned the plaintiff that if he failed to comply with the order, an extraction team would be called.  When the plaintiff still refused to comply, the cell door was partially opened, a one-second burst of chemical agent deployed and the door closed.  The plaintiff immediately moved to the rear of the cell and tried to cover himself with a wet towel.  In response, a second one-second burst of chemical agent was deployed into the cell.

The chemical agent took effect and the plaintiff complied with orders to kneel and put his arms behind his back for handcuffing.  When the cell door was opened to remove the plaintiff from the cell, the walls were clean.  The plaintiff was escorted to the shower unit for decontamination. He did not complain about the time spent under the shower or the water temperature.

The plaintiff was taken to a new cell, provided clean clothing and placed on in-cell restraints. The restraints were applied while the plaintiff was standing upright.  A nurse checked the restraints and determined that the tether was of proper length and there was proper clearance under the restraints.  Medical staff was called to provide further decontamination when the plaintiff complained of burning in his eyes.  The plaintiff, however, refused treatment, became argumentative and would not sit still.  Defendant Saylor ordered the plaintiff to calm down and allow the nurse to flush his eyes.  The plaintiff refused.  The plaintiff was on fifteen minute watch until he was released from in-cell restraint status approximately twenty-four hours later.

October 10, 2008 Incident

The plaintiff attempted to assault two correctional officers by throwing a milk carton out of

11

the food trap in his cell door.  Defendant Rae ordered the plaintiff to put his hands through the food

trap to be handcuffed.  The plaintiff eventually complied with this order.  The plaintiff was strip-

searched and issued new clothing before in-cell restraints were applied.  The plaintiff complained

that the tether chain was too short because correctional staff had looped the chain over the top of the

handcuff chain before securing it to the handcuff ring.  The correctional procedures, however, require

that the tether chain be adjusted to keep the inmate's hands at waist level when standing erect.

Looping the chain over the handcuff chain is the accepted mean of adjusting the tether chain to the

proper length.

After the restraints were applied, they were examined by medical and custody staff.  Both

determined that the restraints were properly applied.  The plaintiff was placed on fifteen-minute

checks until the afternoon of October 12, 2008, when defendant Rae decided to remove the plaintiff

from in-cell restraint status.  When the restraints were removed, the plaintiff's clothing was clean

and he made no complaints that he was unable to use the toilet or eat any of his meals.

### January 9, 2009 Incident

When defendant Lieutenant Harnett tried to distribute legal mail, the plaintiff stuck his arm

through the food trap preventing the trap from closing.  The plaintiff refused all orders to remove

his arm.  Defendant Harnett summoned additional correctional staff to the area to assist in placing

the plaintiff on in-cell restraint status.  By the time the additional staff members, along with a video-

camera operator arrived, the plaintiff had removed his arm from the trap.  Defendant Harnett ordered

the plaintiff to turn around and place his arms through the trap so handcuffs could be applied.  The

plaintiff refused, arguing that there was no need for in-cell restraint status as he had removed his arm

from the trap.

12

When the plaintiff continued to refuse to comply with orders, defendant Harnett called medical and mental health staff.  The social worker got the plaintiff to comply with the order.  The plaintiff was placed in handcuffs and shackles and escorted to another cell.  The plaintiff repeatedly objected to being strip-searched and placed on in-cell restraint status and relaxed his legs to passively disrupt the staff's ability to apply in-cell restraints.  When the staff attempted to strip-search the plaintiff while he was lying on the floor, the plaintiff began kicking his legs.  Correctional staff then physically restrained the plaintiff's legs.  When the plaintiff refused to stand so the tether chain could be applied, defendant Harnett decided to place the plaintiff in four-point soft restraints.

The plaintiff continued to passively resist.  Correctional staff lifted and carried him in a prone, face down position into the next cell and placed him, face-down on the bed.  He was rolled onto his back and soft four-point restraints were applied.  Defendant Harnett checked the clearances and found them proper.  The plaintiff continued to be disruptive and resist removal of the handcuffs.  Fifteen minute watches began at 10:15 a.m.

After fifteen minutes, medical staff entered the cell to take the plaintiff's vital signs.  The plaintiff refused to comply.  The plaintiff did not respond to inquiries during the next few checks.  At 11:37 a.m., defendant Rae offered the plaintiff food and downgraded his status to in-cell restraints.

When defendant Rae began removing the four-point restraints, the plaintiff stated that defendant Harnett purportedly found a pen with a razor attached in the plaintiff's cell in June 2008, and that the plaintiff had found a similar pen found in his cell two days earlier.  The plaintiff stated that he tried to tell defendant Harnett about the second pen, an item not allowed in administrative segregation and asked that the pen be removed from his cell.  Defendant Harnett accused the plaintiff

of having a weapon and stated that the plaintiff would be put on in-cell restraint status.  These purported statements were not the reasons for placing the plaintiff on restraint status.

After the plaintiff was secured on in-cell restraint status, defendant Rae and a nurse checked the clearances and found them proper.  The plaintiff made no complaints about the restraints being tight or the tether chain being short.  The plaintiff was left in the cell with a modified meal.  The following morning, defendant Harnett found the plaintiff's behavior compliant and removed the plaintiff from in-cell restraint status.  At this time, the plaintiff's cell and clothing were clean and the plaintiff made no complaints.

III.   Discussion

In this action, the plaintiff asserts federal law claims for use of excessive force, deliberate indifference to serious medical needs, unconstitutional conditions of confinement, violation of Department of Correction procedures and verbal abuse as well as state law claims of assault and battery.  The defendants argue that the plaintiff cannot establish any genuine issue of material fact regarding any claim; the evidence shows that they acted patiently and professionally and only in response to the plaintiff's disruptive behavior.

A.   Eleventh Amendment

The defendants first argue that the Eleventh Amendment bars all suits for damages against them in their official capacities.  The defendants are correct.  However, the plaintiff alleges that he seeks damages from the defendants in their individual capacities and only injunctive relief against the defendants in their official capacities.  *See* Doc. #1-2 at 8, ¶ 24.

As there is no official capacity claim for money damages, the defendants' motion for summary judgment is denied on this ground.

14

B.    Conditions of Confinement

It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating the failure of prison officials to provide for inmates' "basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989).

An inmate may prevail on an Eighth Amendment claim "only where he proves both an objective element–that the prison officials' transgression was 'sufficiently serious'–and a subjective element–that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, *i.e.*, that his confinement under the alleged conditions violates contemporary standards of decency. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. *See id.* at 185-86. The defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw that inference." *Farmer*, 511 U.S. at 837.

Prisoners have no right to be housed in comfortable surroundings. Restrictions do not violate the Eighth Amendment unless they are "totally without penological justification," "grossly disproportionate," or "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1980) (internal citations omitted). Harsh or restrictive conditions are part of the

15

penalty criminal offenders pay for their crimes. *Id.* at 347; s*ee, e.g., Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (allegation that pretrial detainee was subjected to raw sewage for four days because of inoperative toilet did not rise to level of constitutional violation); *Allebach v. Sherrer*, No. Civ. 04-287, 2005 WL 1793726, at *3-*4 (D.N.J. Jul. 27, 2005) (holding that denial of running water, religious items, visitation, recreation, use of the telephone, mattress and clothing for thirty-six days did not violate the Eighth Amendment).

1.      Urine, Feces and Blood in Cell, Toilet Issues and Hygiene Products

The plaintiff alleges that he was unable to use the toilet while confined on in-cell restraint status and that the cells in which he was confined had urine, feces and blood smeared on the walls, sink and bunk.  He also contends that he was denied hygiene products for four days.

The video recordings submitted by the defendants belie this claim. The recordings show that each time the plaintiff was placed on in-cell restraints after use of a chemical agent, he was provided clean clothing and dressed in a way that enabled him to use the toilet while on in-cell restraints.  The plaintiff's clothing was clean when he was removed from in-cell restraint status.  The video evidence also shows that each cell was clean both when the plaintiff entered and when he left.  At no time, when placed in the cells, did the plaintiff complain on the recordings about the cleanliness of the cells or ask for cleaning supplies.  As explained above, the court can rely on video evidence to establish the facts.  In light of the video evidence, the court concludes that there is no factual basis for the plaintiff's claims that his cells were covered with feces, urine and blood, and that he was unable to use the toilet.

The plaintiff also contends that he was denied hygiene products for four days in January 2009.  Even if true, the denial of hygiene products for four days does not constitute the denial of the

minimal civilized measure of life's necessities.  *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (denial of toilet paper for five days and soap, toothpaste and toothbrush for ten days not of constitutional dimension); *Martin v. Lane*, 766 F. Supp. 641, 648 (N.D. Ill. 1991) (denial of sanitary and hygiene living conditions for between three and eighteen days does not violate Eighth Amendment).  The defendants' motion for summary judgment is granted on these claims.

2.     Food Portions and Lack of Eating Utensils

The plaintiff claims that he did not receive his full morning meal on one day and that, when confined on in-cell restraint status, he was unable to eat his modified meals because he was not provided eating utensils.  Neither claim is of constitutional dimension.

The plaintiff alleged that items were missing from his morning meal.  Even if he had not been provided any meal, the denial of a meal on one occasion does not constitute an Eighth Amendment claim.  *See Gill v. Hoadley,* 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (holding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal).

The Eighth Amendment requires "that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"  *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)).  That the plaintiff was not provided utensils to eat oatmeal from a styrofoam cup, although unfortunate, is not of constitutional magnitude.  *See Thomas v. Owens,* 345 Fed. Appx. 892 (5th Cir. 2009) (prisoner's claim that he was denied, *inter alia*, eating utensils for days held not to state an Eighth Amendment claim); *Stanley v. Page,* 44 Fed. Appx. 13, 15 (7th Cir. Aug. 20, 2002) (prisoner's claim regarding denial of utensils and a need to eat with his hands described only a "temporary inconvenience" and was not cognizable

under the Eighth Amendment); *Martin,* 766 F. Supp. at 648  (holding that a prisoner's allegations concerning the lack of eating utensils were "not cognizable").

The defendants' motion for summary judgment is granted on these claims.

3.    Showering in Restraints

The plaintiff claims that the defendants violated his Eighth Amendment rights by requiring him to shower while wearing shackles.

Requiring a particular inmate to shower while wearing shackles for security reasons does not constitute an Eighth Amendment claim.  *See Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir. 1996); *see also Sanders v. Hopkins*, 131 F.3d 152, 1997 WL 755276, at *2 (10th Cir. 1997) (holding that requiring an inmate in disciplinary segregation to shower in handcuffs and ankle shackles does not violate the Eighth Amendment); *LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir. 1993) (requiring an inmate who had assaulted prison guards and fellow inmates to shower while wearing handcuffs and ankle shackles does not state a claim under the Eighth Amendment).  The defendants have presented evidence that the plaintiff is a dangerous inmate.  He is classified as a Security Risk Group Safety Threat Member and has received over 150 disciplinary charges, over 100 of which are for interfering with institutional safety and security, threats, fighting and assaults on correctional staff or other inmates.  *See* Doc. #98-3, Ex. 40.  The court concludes that requiring the plaintiff to shower wearing shackles does not violate the Eighth Amendment.  The defendants' motion for summary judgment is granted on this claim.

4.    Verbal Abuse

The plaintiff alleges that several correctional staff subjected him to verbal abuse and harassment.  Although unprofessional and inappropriate, such conduct does not constitute a

constitutional violation.  *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 364 (N.D.N.Y. 2010)

("Verbal harassment itself does not rise to the level of a constitutional violation.  Verbal abuse,

vulgarity, and even threats are insufficient to rise to the level of constitutional violations." (citation

omitted)); *see also Morgan v. Ward*, 699 F. Supp. 1025, 1055 (N.D.N.Y. 1988) (noting that

exchange of verbal insults between inmates and guards is a constant daily ritual in prison).

Accordingly, the defendants' motion for summary judgment is granted on this claim.

### 5.    Four-point and In-cell Restraints

Finally, the plaintiff argues that his placement on four-point restraints and in-cell restraints

subjected him to unconstitutional conditions of confinement.  He contends that every time he was

placed on in-cell restraints, he was short-chained, preventing him from being able to stand without

bending over at the waist, and that the restraints were too tight.

The plaintiff's claim that he was short-chained lacks a factual basis.  He alleges that

whenever in-cell restraints were applied, the tether chain was impermissibly wrapped around the

handcuffs.  Although this happened, that fact does not mean that the plaintiff was "short-chained."

The video evidence clearly shows that after the in-cell restraints were applied, the plaintiff was able

to stand comfortably and was not required to bend over at the waist.  In fact, one video shows the

plaintiff stretched out comfortably on the floor with his hands at his waist.  Nor does the plaintiff

complain about the restraints being too tight when they were applied.  The court can rely on this

video evidence to contradict the plaintiff's allegations.  Accordingly, these claims are without merit.

The plaintiff also challenges the length of time he was restrained.  The plaintiff was placed

on in-cell restraint status for seventy-two hours in July 2007, fifteen hours in February 2008, fifty-

three hours in October 2008, and eight hours in January 2009.  After forty-five hours of the seventy-

two hour period, however, the plaintiff was offered the chance to be removed from in-cell restraint status and returned to population.  The plaintiff refused to move and, therefore, remained on in-cell restraint status until the following day.  The plaintiff was confined in four-point soft restraints for four hours in February 2008 and one hour in January 2009.

The maintenance of prison order and security are legitimate governmental objectives. Accordingly, use of restraints that are reasonably related to maintaining prison security, without more, does not violate the Eighth Amendment.  *See Dolphin v. Manson*, 626 F. Supp. 229, 234 (D. Conn. 1986) (citing *Bell v. Wolfish*, 442 U.S. 520, 540 (1979)).  When reviewing the use of restraints under the Eighth Amendment, the court must consider the individual circumstances surrounding the use of restraints, including the length of time restraints were imposed and the objective sought to be served.  *See Ferola v. Moran*, 633 F. Supp. 814, 820-21 (D.R.I. 1985).

As noted above, the plaintiff has a history of serious disciplinary infractions.  Each use of in-cell restraints was precipitated by acutely disruptive actions by the plaintiff.  In July 2007, February 2008 and January 2009, the plaintiff had stuffed objects or put body parts through the food trap, preventing correctional staff from closing the trap.  The plaintiff disregarded repeated orders and efforts by correctional staff to persuade him to remove the obstructions.  In October 2008, the plaintiff attempted to assault correctional staff through the food trap.  The use of four-point restraints was precipitated, in February 2008, by the plaintiff while on in-cell restraint status inciting other inmates to disobey orders and, in January 2009, by the plaintiff's resistance to the application of in-cell restraints.

The defendants have provided evidence that the decisions to utilize in-cell or four-point restraints were intended to control the plaintiff's disruptive behavior, not to impose unnecessary

punishment or the wanton infliction of pain.  The video evidence documents the correctional staff's compliance with the departmental procedures regarding imposition of the restraints and the required periodic medical checks during the time the restraints were in use.  Other courts have found that similar uses of restraints did not violate the Eighth Amendment.  *See, e.g., LeMaire*, 12 F.3d at 1460 ( holding that use of in-cell or four-point restrains in accordance with prison directives, even for extended periods of time, does not constitute an Eighth Amendment violation); *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir. 1988) (holding that handcuffs, shackles and four-point restraints are reasonable measures to maintain order when dealing with violent inmates), *cert. denied*, 491 U.S. 907 (1989); *see also Parks v. Williams*, 157 Fed. Appx. 5, 6 (9th Cir. 2005) (noting that prison security measure taken for the protection of prison officials and the inmate population is constitutional if applied in good faith and not used maliciously).

The court concludes that the video evidence demonstrates that the defendants followed departmental procedures and did not act maliciously.  The defendants' motion for summary judgment is granted on this claim.

C.   Due Process

In addition to challenging his confinement on in-cell restraint status and in four-point soft restraints as unconstitutional conditions of confinement, the plaintiff also argues that the confinements violated his Fourteenth Amendment right to substantive due process.

To establish a substantive due process violation, the plaintiff must identify conduct that may be considered "so brutal and offensive to human dignity as to shock the conscience."  *Silvera v. Department of Corrections*, No. 3:09-cv-1398(VLB), 2012 WL 877219, at *15 (D. Conn. Mar. 14, 2012) (internal quotation marks and citations omitted).  In the prison context, the Supreme Court has

found only two examples of conduct that violated an inmate's constitutionally protected liberty interest: transfer to a mental hospital, and the involuntary administration of psychotropic medication. *See Sandin v. Conner*, 515 U.S. 472, 479 n.4 (1995). There is no liberty interest in avoiding confinement under more adverse conditions. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Confinement on in-cell restraint status or in four-point restraints does not rise to the level of a substantive due process violation. *See, e.g., Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008) (prisoner has no liberty interest in avoiding confinement in four-point restraints for four hours without a nurse present).

The plaintiff also alleges in the complaint that the defendants violated his right to due process by failing to move him to a particular cell. Prisoners, however, have no right to be housed in any particular cell or area within the prison. *See Russell v. Scully*, 15 F.3d 219, 221 (2d Cir. 1993) (holding that inmate has no due process right to be housed in any particular area of the prison). Thus, a refusal to transfer the plaintiff to the cell of his choosing does not state a cognizable constitutional claim.

Finally, the plaintiff contends that the defendants violated his right to due process by failing to comply with correctional administrative directives regarding his placement on in-cell and four-point restraint status. Failure to comply with state-created procedures does not create a protected liberty interest. Fourteenth Amendment due process protections, therefore, are not implicated by the defendants' alleged failure to comply with administrative directives. *See Rhodes v. Hoy*, No. 9:05-CV-836, 2007 WL 1343649, at *2 (N.D.N.Y. May 5, 2007) (holding that due process is not implicated by failure to comply with institutional administrative procedures); *see also Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993) ("A state cannot be said to have a federal due process

obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable."), *overruled in part on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The defendants' motion for summary judgment is granted on the plaintiff's due process claims.

D.   Use of Chemical Agents

The plaintiff contends that the defendants used excessive force against him when they deployed chemical agents to gain his compliance with orders.  When considering the use of force by correctional officers, the court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (internal quotation marks and citation omitted).

The court considers objective and subjective components to an excessive force claim.  *See id.* at 8.  The objective component relates to the level of physical force used against the inmate and whether that force is repugnant to the conscience of mankind.  *See id.* at 9-10.  The subjective component focuses on whether the correctional officers had a "wanton" state of mind when they were applying the allegedly excessive force.  *See id.* at 8.

An excessive force claim cannot be decided merely by considering the extent of an inmate's injuries.  *See Perkins v. Brown*, 285 F. Supp. 2d 279, 283 (E.D.N.Y. 2003) (acknowledging that claim of excessive force may be established even if the victim does not suffer serious or significant injury) (citations omitted).  Instead, the court uses the extent of the inmate's injuries as one factor in determining whether the use of force could have been thought necessary by correctional staff or demonstrated an unjustified infliction of harm.  *See Hudson*, 503 U.S. at 7.  Other factors to be

23

considered are the need for use of force, the threat perceived by correctional staff and the relationship between the perceived threat and the amount of force used. *See id.* For example, an inmate who does not suffer serious or significant injury may establish a claim for use of excessive force if he can show that the force used was more than *de minimis* or was repugnant to the conscience of mankind and that the defendant acted with a sufficiently culpable state of mind. *United States v. Walsh*, 194 F.3d 37, 48-50 (2d Cir. 1999).

This approach is consistent with the view that "[e]xcessive force does not, in and of itself, establish malice or wantonness for Eighth Amendment purposes." *Romano v. Howarth*, 998 F.2d 101, 106 (2d Cir. 1993); *see, e.g., Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006) (affirming denial of summary judgment on excessive force claims where questions existed regarding, *inter alia*, whether actions of correctional staff "were necessary to maintain order or were excessive reactions by frustrated officers; and whether the amount of force used was commensurate with the situation ... whether verbal orders or the application of less force would have been sufficient, whether or not a warning issued before application of the pepper spray"). "Infliction of pain that is 'totally without penological justification' is per se malicious." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981))

The application of force in this case is the deployment of a chemical agent. The defendants argue that the use of the chemical agent was warranted because the plaintiff refused repeated orders and requests to remove obstructions from the food trap. The repeated orders from correctional staff and the requests from medical and mental health staff are documented on the video evidence. Following specific warnings, the chemical agent was used instead of hands-on force. Once the plaintiff complied with orders, use of the chemical agent ceased. The plaintiff was immediately

restrained and escorted to the shower area for decontamination.

The Supreme Court encourages courts to "give a wide range of deference to prison officials acting to preserve discipline and security." *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986). Courts considering the use of chemical agents have held that deployment of a chemical agent is an accepted means of controlling an unruly or disruptive inmate. *See, e.g., Scroggins v. Davis*, 346 Fed. Appx. 504, 505 (11th Cir. 2009) (use of chemical agent to subdue high-risk inmate was not excessive), *cert. denied*, 130 S. Ct. 1711 (2010); *Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir. 1984) ("the chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern"), *cert. denied*, 470 U.S. 1085 (1985). When reviewing the use of a chemical agent against a recalcitrant inmate, the court can find a constitutional violation only where the use of the chemical agent is malicious and sadistic. That the use may have been objectively unreasonable is insufficient to establish an Eighth Amendment claim. *See Howard v. Nunley*, No. CV-06-00191-NVW, 2010 WL 3785536, at *4 (E.D. Cal. Sept. 24, 2010) (considering use of chemical agent against inmate who deliberately violated direct orders).

The largest number of deployments of chemical agent occurred on February 14, 2008. The plaintiff alleges that defendant Casey deployed a chemical agent eleven times, with each deployment lasting between three and five seconds. The video evidence shows this allegation an exaggeration. The chemical agent was deployed between five and seven times, each time for one second. The number was so large because the plaintiff refused to comply with orders. For example, when the cell door was opened after initial deployment, the plaintiff came out of the door in a threatening manner and taunted correctional staff. After additional deployments, the plaintiff still refused to present his hands so restraints could be applied and told defendant Casey that he would have to utilize the

chemical agent more times before the plaintiff would cooperate.  *See* Defs.' Local Rule 56(a) Statement, Ex. 14.

The video evidence clearly shows that, on all occasions, the use of a chemical agent was precipitated by the plaintiff's actions.  The chemical agent was deployed only after many direct orders and attempts to persuade the plaintiff to comply.  As soon as the plaintiff complied with the orders, he was restrained and escorted to the shower to be decontaminated.  The court concludes that the video evidence clearly shows that no defendant acted maliciously or wantonly regarding the use of a chemical agent.  Accordingly, the defendants' motion for summary judgment is granted on this claim.

E.      Deliberate Indifference to Medical Needs

The plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs arising from the use of chemical agents and the imposition of in-cell restraints and four-point soft restraints.

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To state such a claim, the plaintiff must allege facts demonstrating sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  *Id.* at 104-06.

Because mere negligence will not support a section 1983 claim, not all lapses in prison medical care constitute a constitutional violation.  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  In addition, inmates are not entitled to the medical treatment of their choice.  *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Mere disagreement with prison officials about what

26

constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The conduct complained of must "shock the conscience" or constitute a "barbarous act." *McCloud v. Delaney*, 677 F. Supp. 230, 232 (S.D.N.Y. 1988). In addition, the fact that a prison official did not alleviate a significant risk that he should have but did not perceive does not constitute deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

There are both subjective and objective components to the deliberate indifference standard. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The condition must produce death, degeneration or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

After each incident during which a chemical agent was deployed, the plaintiff was taken to the shower area for decontamination. Following decontamination, medical staff flushed the plaintiff's eyes if he complained of irritation. The residual effects of a chemical agent, however, do not constitute a serious medical need. *See Blond v. City of Schenectady*, No. 10-CV-0598, 2010 WL 4316810, at *5 (N.D.N.Y. Oct. 25, 2010) (denial of ability to rinse eyes for thirty to sixty minutes after being sprayed with chemical agent was not serious medical need); *Strassner v. O'Flynn,* No. 04-CV-6021CJS, 2006 WL 839411, at *8 (W.D.N.Y. Mar. 27, 2006) (exposure to temporary discomfort of pepper spray is not a serious medical need) (citing cases).

The plaintiff also alleges that he suffered pain from the restraints.  The video evidence demonstrates that, while confined in four-point soft restraints, the plaintiff was checked every fifteen minutes by medical staff.  On occasion, he refused to allow medical staff to take his temperature while on four-point restraints.  Frequently, the plaintiff refused to uncover his restraints or approach the cell door for in-cell restraints to be checked.  The plaintiff did not complain of any pain during these checks.  He also alleges that he experienced redness or slight bruising from restraints.  Such complaints do not rise to the level of a serious medical need.  Other minor medical complaints, such as a scratch on his arm, were addressed by the medical staff.  The fact that the plaintiff may have preferred a different treatment does not support an Eighth Amendment claim.

The court concludes that the plaintiff has not presented any evidence that he suffered a serious medical need as a result of the incidents underlying the complaint.  Accordingly, the defendants' motion for summary judgment is granted as to any claims for deliberate indifference to a serious medical need.

F.    State Law Claims

The plaintiff includes in his complaint various state law claims.  Where no federal claims remain in a lawsuit, the district court may decline to exercise supplemental jurisdiction and leave the state law claims to be considered by the state courts.  *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims where all federal claims have been dismissed); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases). As the court has granted summary judgment in favor of the defendant on the federal claim, it declines to exercise supplemental jurisdiction over the remaining state law claims.

IV.      Conclusion

The defendants' motion for summary judgment [**Doc. #98**] is **GRANTED**.  The Clerk is

directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED**

Dated:  New Haven, Connecticut
        December 7, 2012.

        _/s/ Charles S. Haight, Jr._
        Charles S. Haight, Jr.
        Senior United States District Judge